UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PARK LAWN CAPITAL LIMITED, INC.,　　　Case No. 19-13741

　　　　　　Plaintiff,　　　　　　　　　Stephanie Dawkins Davis
v.　　　　　　　　　　　　　　　　　United States District Judge

UNITED STEELWORKERS LOCAL 13702,

　　　　　　Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 15) AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 14)**

## I.　PROCEDURAL HISTORY

Plaintiff, Park Lawn Capital Limited, Inc. (Park Lawn), filed the present suit

to vacate the arbitration award reducing the discipline it imposed on several

employees, who are members of the local bargaining unit, United Steelworkers

Local 13702 (the Union).  (ECF No. 1).  Park Lawn claims that grievances were

untimely as to all unit members except one and that the arbitration award must be

vacated as violative of public policy.  The parties filed cross-motions for summary

judgment, which are fully briefed.  (ECF Nos. 15-19).  Pursuant to notice, the court

held a hearing, via video, on January 20, 2021.  (ECF No. 23).

For the reasons set forth below, the Court **GRANTS** defendant's motion for summary judgment, **DENIES** plaintiff's motion for summary judgment, and **AFFIRMS** the arbitration award.

## II.   FACTUAL BACKGROUND

Park Lawn owns Forest Lawn Memorial Park in Detroit, Michigan.  It took over the day-to-day management and supervision of Forest Lawn in January 2019. At the time that Park Lawn took over the management of Forest Lawn Cemetery, Park Lawn agreed to assume the collective bargaining agreement (CBA) between MMG, its predecessor, and the Union.  Local 13702 represents the Forest Lawn cemetery "grounds crew" unit.  There are five full-time unit workers.  The unit is governed by a CBA that includes a grievance-arbitration procedure, requires advance labor-management discussion of "new working rules," and requires "just cause" for discipline.  (ECF No. 14-2, Award at 5, 11-13, 19; ECF No. 14-3, CBA Art. V and IX, Sec. 1).  On January 11, 2019, shortly after Park Lawn bought Forest Lawn Cemetery and assumed the CBA, unit members and cemetery workers, David Messingham and Tom Vanicelli, met with Superintendent Jeffrey Teal.  Vanicelli is also the Local 13702 Steward, with CBA authority for "negotiating the settlement of grievances or disputes arising between the parties." (ECF No. 14-2, Award at 5-6; ECF No. 14-3, CBA Art. IV, Sec. 1).  Messingham and Vanicelli protested to Teal that the "N-word" was being used "loosely" in the

2

workplace.  They asked that Park Lawn "stop this practice which had been going on for several years."  (ECF No. 14-2, Award at 5-6, 8, 21).

In his decision, the arbitrator characterized such workplace conversation at Forest Lawn as "shop talk" and "barracks language," which included the "F-word" and on "several occasions," the "N-word," although it was "not directed toward each other, but just in general."  The "N-word" was "never used against an individual."  (ECF No. 14-2, Award at 8, 21-22, 24).  Three of the unit employees, Messingham, Vanicelli, and Juan Huertas, are not black.  Two of the unit employees, Anthony Williams and Wilmer "Pete" Austin are black. Superintendent Teal participated in the "shop talk" and "barracks language." Some unit employees used the "N-word," but not "everyone."  (ECF No. 14-2, Award at 8, 21-24).  More specifically, as detailed in HR Director Fielder's interview notes, the two black unit members—not "anyone else"—used the "N-word" as banter in "the break room, listening to music" or "on the phone."  The one "occasion" specified in Fielder's notes was when a black employee quoted his wife, who used the word to scold her husband—for emphasis, not racial derogation.  (ECF No. 17-4, Ex. C, J9 at 13-19).  The notes show that the "shop talk" was only among the "guys," including "the supervisor," and never around "families" patronizing Forest Lawn.  (ECF No. 17-4, Ex. C, J9 at 2, 5, 8, 16, and 18).  Teal was aware that this language was "inappropriate," but he never

disciplined anyone for its use.  According to Teal, management told him not to do so.  The arbitration decision makes clear that tolerance for this language was "a long past practice" at Park Lawn's predecessor, Forest Lawn.  (ECF No. 14-2, Award at 8, 21-24).

Teal apparently failed to follow up on the complaint lodged by Messingham and Vanicelli.  Messingham and Vanicelli met twice more with Superintendent Teal, again requesting action.  After the third protest, Steward Vanicelli told Teal that he would lodge a grievance if no action was taken.  The parties then entered into an Extension Agreement, which gave Park Lawn additional time to answer the union complaint.  Teal, Vanicelli, and Messingham all signed the Agreement. (ECF No. 14-2, Award at 6, 21; ECF No. 14-4, PageID.212).

In response to the complaint, Park Lawn's Human Resources Director Suzette Fielder visited Forest Lawn on January 29 and 30, 2019 to interview the unit employees.  (ECF No. 14-2, Award at 6, 9, 21-22).  Of the five unit employees, only the two black employees, acknowledged using the "N-word" in the workplace at some time in the past.  They specified that they used it "in general," but not directed at other employees or any other individual.  (ECF No. 14-2, Award at 8-9 and 22).  The investigation also revealed that all unit members had openly and regularly "look[ed] at pictures of women," often commenting on women's "titties, butt, [and] body."  (ECF No. 15-11, JX-9 at 16 and 18).

4

Fielder told unit employees that their interviews were confidential and there would be no retaliation from Park Lawn.  Fielder did not tell the employees that they were accused of conduct that would subject them to discipline.  Park Lawn had no "work rules" or handbook addressing workplace language and had never given the employees guidelines or expectations.  Fielder did not give the employees the opportunity to respond to others' accounts of the employees' past language or tell the employees that the interviews could lead to discipline.  (ECF No. 14-2, Award at 9-10, 17-18, 22, 24-25; ECF No. 14-4, Ex. J9).  Arbitrator McDonald found that Park Lawn did not give any notice of its expectations and, by not warning of potential discipline, that Park Lawn deprived the employees of due process.  (ECF No. Award at 9-10, 17, 21-22, 25).

On February 21, 2019, Park Lawn Vice President of Operations, Mat Forastiere, disciplined all five employees for their use of race and gender-based language.  He gave each employee a "first and final" written warning.  He wrote that "further participation" in "inappropriate or unprofessional conduct" or "violations" of the CBA "and/or federal law will result in immediate termination of your employment."  (ECF No. 14-2, Award at 3; ECF 14-4, PageID.216-225, J3-J7).  Park Lawn delivered the "final" warnings to four of the unit members on February 21, 2019 while Vanicelli was on vacation.  Park Lawn delivered the

warning letter to Vanicelli after he returned to work on March 18, 2019.  (ECF No. 14-2, Award at 4, 6-7, 23).

Vanicelli filed a grievance on behalf of the entire unit on March 21, 2019. In the grievance, the union challenged the "unjust writeup-discipline" imposed on the five members of the unit.  The union alleged that the discipline imposed violated the CBA.  Three members, Vanicelli, Austin, and Williams, signed the grievance "for the union."  The grievance requested that Park Lawn "remove [the] first and final written warning."  (ECF No. 14-2, Award at 19-20; ECF No. 14-4, J2).  During the grievance process, the union contended that Park Lawn lacked just cause, that Park Lawn imposed the discipline without fair notice, and that the union itself had raised the issue of the offending language and, in response, Park Lawn retaliated against the unit members.  (ECF No. 14-2, Award at 7, 17-18, 20).

The grievance proceeded through the pre-arbitration steps without resolution.  Park Lawn and the union then jointly selected Arbitrator McDonald, one of three CBA-approved arbitrators, "to receive evidence and render a final and binding decision."  (ECF No. 14-2, Award at 2, 11).  Arbitrator McDonald conducted an evidentiary hearing on August 7, 2019.  The parties had the opportunity to present testimony and exhibits at the hearing.  Arbitrator McDonald issued his Award on September 23, 2019.  He concluded that Park Lawn violated "due process," "abused its discretion," and lacked "just cause" for the final

warnings.  (ECF No. 14-2, Award at 25).  Arbitrator McDonald sustained the grievance in part and denied the grievance in part.  He concluded that Park Lawn had cause to impose "first" warnings but lacked just cause to impose the "final" warnings.  (ECF No. 14-2, Award at 25-26).

## III.  DISCUSSION

### A.  Standard of Review

Review of an arbitration award "is one of the narrowest standards of judicial review in all of American jurisprudence."  *Way Bakery v. Truck Drivers Local No. 164*, 363 F.3d 590, 593 (6th Cir. 2004) (internal quotation and citation omitted); *Fed. Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 866 (6th Cir.1990) (describing the court's role as "extremely limited").  Indeed, "[a]s long as the arbitrator's award draws its essence from [an agreement], and is not merely [the arbitrator's] own brand of ... justice, the award is legitimate."  *United Paperworkers Int'l Union v. Misco, Inc*., 484 U.S. 29, 36 (1987) (internal quotation and citation omitted).  The standard of review of an arbitrator's decision is so liberal, that the Supreme Court has held, "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision."  *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quotations and citations omitted).  The Sixth Circuit has held,

"we will consider only the questions of 'procedural aberration' outlined by the Supreme Court." *See Truck Drivers Local No. 164 v. Allied Waste Systems, Inc.*, 512 F.3d 211, 216 (6th Cir. 2008) (6th Cir. 2008) (citing *United Paperworkers International Union v. Misco, Inc*., 484 U.S. 29 (1987), *and Major League Baseball Players Association v. Garvey*, 532 U.S. 504, (2001)).

The standard of review on a motion to vacate an arbitration award was set forth by the Sixth Circuit in *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 476 F.3d 746, 753 (6th Cir. 2007).  The reviewing court must consider the following three questions: (1) "[d]id the arbitrator act 'outside his authority' by resolving a dispute not committed to arbitration? (2) Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? (3) And in resolving any legal or factual disputes in the case, was the arbitrator 'arguably construing or applying the contract'?"  The Sixth Circuit went on to say, "[s]o long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made "serious," "improvident" or "silly" errors in resolving the merits of the dispute."  *Id*.  As to the "arguably construing" inquiry, the Sixth Circuit had made clear that only the "most egregious" awards will be vacated under this standard.  *Michigan Family Resources*, 475 F.3d at 753.  In such circumstances, an arbitrator's "interpretation of a contract thus could be 'so

8

untethered to' the terms of the agreement, … that it would cast doubt on whether the arbitrator indeed was engaged in interpretation." *Id*. (internal citation omitted).

B.   Timeliness of Grievance

Park Lawn first argues that the arbitration award must be vacated because the arbitrator failed to recognize the strict time limits in which a grievance may be filed, as set forth in the CBA.  As Park Lawn explains, it raised two procedural issues before the Arbitrator:  (1) whether the scope of the Union's grievance can be extended to capture the purported claims of those who were not named and did not sign the face of the grievance; and (2) whether the procedurally untimely claims of the grievants who received their disciplinary letters on February 21, 2019, were properly before the Arbitrator.  Park Lawn argues that, while the Arbitrator acknowledged the timeliness issue, he failed to address or analyze it under the terms of the CBA.  Accordingly, Park Lawn maintains that the Arbitrator failed to "arguably construe or apply the contract." *Michigan Family Resources*, *supra*. According to Park Lawn, had the arbitration decision properly drawn its essence from the contract, the Arbitrator would have either recognized the "time limits [] are of the essence" and found that the underlying grievance was untimely for the majority of the bargaining unit or the Arbitrator would have explained why the contractual time limits were inapplicable or could be ignored in this case.

The Union maintains that the Arbitrator arguably construed or applied the contract when he concluded that the grievance was procedurally "ready" for a "final and binding decision."  (ECF 14-2, Award at 4, 19-20).  The Union argues that the Arbitrator's "honest judgment" on this "procedural" question is entitled to judicial deference. *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 37-38 (1987).

Article V of the CBA sets forth the grievance procedure.  At step one, the employee, with or without the Union steward shall take up the grievance with the superintendent within three working days of the date of "its occurrence" (the alleged violation of the CBA) and the supervisor shall respond within three working days.  (ECF No. 14-3, PageID.190).[1]  It is clear, and the parties do not dispute, that the grievance was timely as to Vanicelli because it was submitted within three days of his receipt of the disciplinary letter.  The question before the Court is whether the Arbitrator made any factual findings regarding the timeliness of the grievance as to the remaining unit members.  Pertinent case law teaches that there is a presumption that disputes over timeliness are for an arbitrator decide, even where the collective bargaining agreement is silent on the issue.  *United*

---

[1] The Union seems to suggest that the step one occurrence is when Vanicelli and Messingham first raised the racial language matter with Teal.  (ECF No. 17, PageID.522).  It is clear, however, that the grievance submitted to the arbitrator was for the "unjust write-up – discipline", the first step of which is dated March 21, 2019.  (ECF 14-4, PageID.214-215).  "Its occurrence" refers back to the prefatory language in Article V, Section 1:  "Any grievance involving an alleged violation of a specific article or section of the Agreement, raising during this agreement, shall be settled in the following manner…"  (ECF No. 14-3, PageID.190).

*Steelworkers of America, AFL-CIO-CLC v. Saint Gobain Ceramics & Plastics, Inc.*, 505 F.3d 417 (6th Cir. 2007).  Here, nothing in the CBA suggests that the issue is one for the court, and thus the issue of timeliness was properly before the arbitrator.  There is also no question that the issue of timeliness was raised before the Arbitrator, as is evident in the decision.

In the present case, the arbitration award "cannot be said to be so untethered from" the CBA as to warrant its reversal.  As was the case in *Michigan Family Resources*, the award here "has all the hallmarks of interpretation[, in that it] quotes from and analyzes the pertinent provisions of the contract, and at no point does [it] say anything to indicate that the [arbitrator] was doing anything other than trying to reach a good-faith interpretation of the contract."  *Id*. at 754.  As discussed in *Alcoa, Inc. v. Int'l Union, Automobile, Aerospace, Agricultural Implement Workers of America*, 2013 WL 6903762 (N.D. Ohio Dec. 31, 2013), an arbitration award that "applie[s] context to interpret seemingly explicit language," will be enforced as one where "the arbitrator appeared to be engaged in interpretation."  *Id*. (quoting *Appalachian Regional Healthcare, Inc. v. Ky. Nurses Ass'n*, 2007 WL 4269063, at *2 (6th Cir. Dec. 4, 2007).  The *Alcoa* decision goes on to explain that, as to what constitutes "explicit contract language," the Sixth Circuit suggests in *Kroger Company v. United Food & Commercial Workers Union Local 876*, 284 Fed. Appx. 233, 239 (6th Cir. 2008) that only such "cut-and-

11

dry numerical" contract language as a precise wage amount will be considered to have such plain meaning that no interpretation is needed.  *Id*. at 240 n. 3 (citation omitted).

Here, Park Lawn's argument suggests that it believes the grievance procedure found in Article V constitutes such cut-and-dried contractual language. In the court's view, the language at issue is open to interpretation.  As set forth above, Step I of the grievance says that the employee, "with or without the Union steward" shall take up the grievance with the superintendent within three working days of the date of the alleged violation of the CBA.  What is not clear from this language is what happens when an employee wants the Union steward to take up the grievance, but the steward is not available (as was the case here) during that three-day period.  The grievance procedure further provides that the supervisor's response to a Step I grievance shall be made *to the steward*.  (ECF No. 14-3, PageID.14-3).  Further, Step II of the grievance procedure requires the written grievance to be submitted *by the steward* and response made *to the steward*.  *Id*. Given the timing of the disciplinary letters, even if the unit members had pursued a grievance within three days of their issuance (which Park Lawn chose to issue while the steward was unavailable), the grievance process could not be continued until Vanicelli returned from vacation, several weeks later.  The arbitrator could have reasonably concluded that the CBA permits an employee to wait until the

steward is available, so the employee is able to exercise his choice to pursue with the grievance with the steward, a conclusion which is further supported by the need for the availability of the steward throughout the grievance process. *See e.g.*, *Solo Cup Operating Corp. v. Int'l Bro. of Teamsters, Local 528*, 226 F.Supp.3d 1374, 1380 (S.D. Ga. 2017) ("A contract may be susceptible to interpretation when it is not facially ambiguous.") (quoting *Wiregrass Metal Trades Council v. Shaw Envtl. & Infrastructure, Inc.*, 837 F.3d 1083, 1091-92 (11th Cir. 2016)). Importantly, case law does not require the arbitrator to explain his reasoning or to have made such express findings. *Id*. (citing *Wiregrass*, at 1091-1092). Instead, when interpreting a collective-bargaining agreement, an arbitrator is permitted to "discover" and apply implied terms in the agreement. *Id*. (citing *Wiregrass*, at 1088). Thus, when an arbitrator fails to specifically state his reasoning for an award, the award may be reasonably viewed as an interpretation or as a modification. *Id*. (citing *Wiregrass*, at 1091-92). In those instances, "the court must resolve the ambiguity by finding that the award is an interpretation of the contract and enforcing it." *Id*. at 1092.

In *Solo Cup*, the CBA vested Solo with the exclusive right to change or eliminate existing methods of operation, equipment, and facilities. The CBA also established a grievance procedure and if the parties were unable to resolve their differences, an arbitrator would do so. The arbitrator's decision was final and

binding, the CBA provided that the arbitrator had no power to add to, subtract from, or modify the terms of the CBA.  The CBA also prohibited discrimination based on disability, among other bases, and incorporated the Americans With Disabilities Act.  *Id*. at 1377.  Ms. Wells was a Solo employee and forklift operator, who had used a sit-down forklift.  Solo transitioned to using stand-up forklifts and soon, Ms. Wells began suffering adverse effects, including swollen ankles, back pain, and numbness in her feet.  Her physician recommended that she be allowed to use a sit-down forklift or take a 15-minute break for every hour she spent on the stand-up forklift.  Solo allowed her to spend 15 minutes performing other duties for every hour she spent on the stand-up forklift.  Her physician subsequently recommended 30-minute breaks for every hour spent on the stand-up forklift or the use of sit-down forklift.  Solo denied these requests and when she reported her physician offered no other accommodations, Solo terminated her employment.  The grievance was denied, and the parties proceeded to arbitration. *Id.* at 1377.

At the arbitration, Solo argued that its decision to implement the stand-up forklifts fell within the express provision of the CBA allowing it to choose equipment and that providing Wells with a sit-down forklift was not a reasonable accommodation under the ADA.  The arbitrator determined that Solo had violated the CBA by not providing a reasonable accommodation.  Wells was awarded back

14

pay and reinstatement, along with a sit-down forklift accommodation. *Id*. at 1378.

Solo filed suit and claimed that the award should be modified because the

arbitrator usurped Solo's power to implement new equipment under the CBA,

among other reasons.  The union argued that the arbitrator's award constituted a

permissible interpretation of the CBA.  *Id*. at 1379.   In the decision, the arbitrator

outlined the parties' arguments, the background facts, and the relevant provisions

of the CBA, including the equipment provision.  The arbitrator did not expressly

rely on any particular principle of contract interpretation or specifically state why

the CBA allowed him to issue the award.  Instead, he acknowledged Solo's right to

move to the use of stand-up forklifts, but concluded that Solo was still required to

accommodate Wells with a sit-down forklift.  *Id*. at 1380.  Solo argued that the

decision was contrary to its "incontrovertible right to eliminate sit-down style

forklifts."  The court disagreed, concluding that while it could be argued that the

award infringed on Solo's rights under the CBA, the arbitrator's lack of

explanation "is just as easily perceived as a permissible interpretation of the

contract."  *Id*.  The court's conclusion was not based on the express analysis of the

arbitrator.  Instead, the court found that the arbitrator's mention of Solo's rights

under the equipment provision "arguably shows" that he analyzed any potential

conflict between that provision and the ADA provision and "may have

determined" that Solo had duty to provide a reasonable accommodation, regardless of its general power to manage equipment. *Id*. at 1381.

Here, the arbitrator's decision also "arguably shows" that he reviewed the grievance procedure, evaluated Park Lawn's argument that the grievance was untimely as to all but Vanicelli, and concluded that the grievance was timely as to all unit members. Notably, the arbitrator here emphasized in his factual summary that the union steward, Vanicelli, was on vacation when the other employees in the unit received their "first and final warning" letters and that he filed the grievance on his return from vacation, when he received his own disciplinary letter. (ECF No. 14-2, PageID.163). As the Union points out, Vanicelli was the unit member with authority to negotiate "the settlement of grievances or disputes arising between the parties." (ECF No. 14-3, PageID.190, Art. IV, § 1). The arbitrator also outlined the pertinent provisions of the CBA, including the grievance procedure, which requires the participation of the union steward throughout. (ECF No. 14-2, PageID.168). He then summarized Park Lawn's claim that only Vanicelli's grievance was timely, that only three employees signed the grievances, and two did not sign it and therefore did not intend to the join the grievance. (ECF No. 14-2, PageID.170-171). The arbitrator extensively discussed the evidence relating to whether the grievance was filed on behalf of the entire unit, including those who were not signatories. In the Discussion and Decision section of the

Award, the arbitrator again acknowledged Park Lawn's timeliness challenge and

its claim that the grievance was not submitted on behalf of the entire unit.  The

arbitrator concluded that there was sufficient evidence of an intent to file the

grievance on behalf of all unit members.  While he did not expressly say so, this

discussion would not have been relevant or necessary unless the arbitrator had also

determined that the grievance was timely as all unit members.  (ECF No. 14-2,

PageID.176-177).  This conclusion is buttressed by the arbitrator's statement that

"this matter" was "ready for Decision and Award."  (ECF No. 14-2, PageID.161).

Accordingly, regardless of whether the court agrees or disagrees with the

correctness of the arbitrator's conclusion, the court finds that the arbitrator

considered and rejected Park Lawn's timeliness argument and that conclusion

arguably draws its essence from the CBA.  *See Major League Baseball Players*

*Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) ("[I]f an arbitrator is even arguably

construing or applying the contract and acting within the scope of his authority, the

fact that a court is convinced he committed serious error does not suffice to

overturn his decision.") (quotations and citations omitted); *Bhd. of Locomotive*

*Engineers and Trainmen v. Union Pac. R.R. Co*., 719 F.3d 801, 807 (7th Cir. 2013)

(A court's task is "limited to determining whether the arbitrator's award could

*possibly* have been based on the contract.") (emphasis added); *United Steelworkers*

*of Am. v. Enterprise Wheel & Car Corp*., 363 U.S. 593, 598 (1960) ("A mere

17

ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award.").

C.    Public Policy

Park Lawn also argues that the Award must be vacated as contrary to public policy because the actions of the unit members violated Title VII by creating a hostile work environment.  "[A] court's refusal to enforce an arbitrator's interpretation of such contracts is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant," which, in turn, must be "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Columbia Gas of Ohio, Inc. v. Utility Workers Union of America*, 329 Fed. Appx. 1, 2 (6th Cir. 2009) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987) (internal quotation marks and citation omitted).  Whether the contract, as interpreted by the arbitrator, is contrary to public policy is a question to be resolved by the courts.  *Id.* (citing *Misco*, 484 U.S. at 43).  As the Sixth Circuit went on to explain, the "Supreme Court has made clear that the pertinent question at this juncture is whether the contract, as interpreted—i.e., a contractual agreement to suspend rather than discharge Rose—falls 'within the legal exception that makes unenforceable 'a collective-bargaining agreement that is contrary to

18

public policy.'" *Columbia* Gas, Fed. Appx. at 4 (*E. Associated Coal Corp. v.*
*United Mine Workers of Am.*, *Dist. 17*, 531 U.S. 57, 62 354 (2000) (quoting *W.R.*
*Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983).  Notably, "the issue is
not whether the grievant's conduct violates public policy, but whether enforcement
of the contract, as interpreted, would be contrary to public policy." *Id*. (citing *E.*
*Associated Coal Corp.*, 531 U.S. at 62-63).

Here, Park Lawn contends that the conduct at issue "constitutes both a plain
violation of federal workplace discrimination laws and a transgression of generally
accepted standards of social norms." (ECF No. 15, PageID.286).  Park Lawn
contends that reducing the discipline to a first warning "flies in the face of that
well-defined public policy behind Title VII." *Id*.  Park Lawn maintains that
implementing what is characterizes as "progressive discipline" is an improper
modification of the CBA and asserts that the public policy underpinning Title VII
"leaves no room for such misconduct in the workplace." *Id*. at 287.

In response, the Union contends that there was no hostile work environment
present.  The Union explains that the "N-word" was used by two black employees,
"in general"—never directed at any individual—and the "behaviors" regarding
"race and/or gender" were not hostile.  HR Director Fielder's interview notes show
that the two black unit members—not "anyone else"—used the "N-word" as banter
in "the break room, listening to music" or "on the phone."  The one occasion

19

specified in Fielder's notes was when a black employee quoted his wife, who used the word to scold her husband—for emphasis, not racial derogation.  (ECF No. 17-4, Ex. C, J9 at 13-19).  The notes show that the "shop talk" was only among the "guys," including "the supervisor," and never around "families" patronizing Forest Lawn.  (ECF No. 17-4, Ex. C, J9 at 2, 5, 8, 16, and 18).  The Union also contends that it was management who failed to respond to the complaints about the use of the N-word, and then broke its promises about confidentiality and retaliated by punishing the protestors with a "final" discipline.

The present issue is controlled by *Way Bakery*, *supra*.  In *Way Bakery*, the Sixth Circuit affirmed the enforcement of an arbitration award that required an employee who made a racist remark to a black co-worker to be allowed to return to work.  *Id*. at 596 ("Zentgraf, a white employee, told Diana Thomas, an African–American coworker, to 'relax Sambo.'").  The employee was discharged for the racist remark, but the arbitrator reduced his discharge to an unpaid six-month suspension and reinstatement to his job subject to five-years of probation.  *Id*. at 592.  The employer argued that the arbitrator's award should be set aside because his reinstatement violated Title VII's policy of ridding the workplace of racial harassment.  *Id*. at 594.  The Sixth Circuit observed, "the question to be answered is not whether the [employee's conduct] itself violates public policy, but whether the agreement to reinstate him does so."  *Id*. at 596 (quoting *E. Assoc. Coal Corp.*,

531 U.S. at 62-63).  The Sixth Circuit found that the discipline imposed by the arbitrator – the six-month suspension and the five-year probation – comported with Title VII's policy of maintaining a harassment-free workplace, and no case established "a public policy of flatly prohibiting the reinstatement of a worker who makes a racially offensive remark."  *Id*.  Importantly, the court found that the arbitrator's award did not condone or fail to discourage the hostile workplace behavior at issue.  Instead, the award recognized that a serious offense had occurred and subjected the offending employee to serious penalties.  *Id*. at 595-596.

Similarly, the award here recognized that so-called "shop talk" or "barracks language" does not permit the use of the N-word or other divisive or demeaning language and that continued use of such language would result in further disciplinary action.  (ECF No. 14-2, PageID.183).  But, the arbitrator also found that Park Lawn should have notified the unit employees that the past practice of using such language would no longer be tolerated and that their conduct and language could subject them to warnings, discipline, and termination under the CBA.  By not warning the employees, the award found that the employer placed all unit members in immediate danger of termination, without due process.  *Id*. at PageID.181-182.  And, in contrast to the racist language used in *Way Bakery*, the language here was not used affirmatively against anyone, as detailed above.  The

21

context in which the N-word was used by the two black unit employees here stands in stark contrast to the racist language used by a white employee against a black co-worker in *Way Bakery*.  Thus, if the reduced discipline in *Way Bakery* did not violate public policy, then it surely does not do so here.  Indeed, the reduced disciplinary award balances the public policy underpinning Title VII with the rights of the unit employees to receive due process.  Accordingly, in the court's view, Park Lawn has not shown that the reduced discipline, which is still disciplinary action against all the unit members, violates the public policy underpinnings of Title VII.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the Court **GRANTS** defendant's motion for summary judgment, **DENIES** plaintiff's motion for summary judgment, and **AFFIRMS** the arbitration award.

**IT IS SO ORDERED**.

Date: March 31, 2021                    s/Stephanie Dawkins Davis
                                        Stephanie Dawkins Davis
                                        United States District Judge